UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

LINDA ANN IRVING,                    )
                                     )
        Plaintiff                    )
                                     )
v.                                   )          2:10-cv-000367-MJK
                                     )
                                     )
TOWN OF CAMDEN, ROBERTA SMITH,       )
AND PHILIP ROBERTS,                  )
                                     )
        Defendants                   )


# MEMORANDUM OF DECISION[1] ON
# CROSS MOTIONS FOR SUMMARY JUDGMENT

Linda Ann Irving is suing the Town of Camden, Town Manager Roberta Smith, and

Chief of Police Philip Roberts,[2] on the theory that they should be held accountable for what she

perceives as a failure to properly investigate her allegations that her neighbor unlawfully entered

her home to steal computer compact discs with the ultimate goal of stealing her financial

identity.  As of her January 19, 2011, deposition, Irving has never had anything happen to her to

suggest that her identity was stolen as a result of the break-in at her residence in March 2008.[3]

Irving has made it clear that she is not pursuing relief under a due process theory but is seeking

42 U.S.C. § 1983 redress for violations of her right to equal protection under the Fourteenth

Amendment stemming from nondefendant Camden police officers' violations of her First

Amendment rights.  (Pl.'s Reply/Resp. Mot. Summ. J. at 4, Doc. No. 37.)  She also is pursuing

relief under 42 U.S.C. § 1985 on a theory of conspiracy.  (Id.)  "The policy-making status of

---

[1]     Pursuant to 28 U.S.C. § 636(c), the parties have consented to have United States Magistrate Judge Margaret
J. Kravchuk conduct all proceedings in this case, including trial, and to order entry of judgment.
[2]     There is no dispute between the parties that at all times relevant the three defendants were acting under
color of state law.  See American Mfrs. Mut. Ins. Co. v. Sullivan, 526 U.S. 40, 49-50 (1999).
[3]     Irving insists that the current security or insecurity of her accounts is not relevant to the cause of actions in
her second amended complaint. She admits the factual statement, however.

Defendants Roberts and Smith in their official capacities," she states, "attaches liability to their employer, the Town of Camden." (Id.)[4]  The defendants have responded to Irving's own motion for summary judgment and moved for summary judgment in their favor.  I now deny Irving's motion for summary judgment and grant the defendants judgment on their motion.

## DISCUSSION

**A.      Standard for Cross Motions for Summary Judgment**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Once a properly documented motion has engaged the gears of Rule 56, the party to whom the motion is directed can shut down the machinery only by showing that a trialworthy issue exists."  McCarthy v. Northwest Airlines, Inc., 56 F.3d 313, 315 (1st Cir. 1995) (citing  National Amusement Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995)).  The First Circuit has explained apropos cross motions for summary judgments:

> Cross motions for summary judgment neither alter the basic Rule 56 standard, nor warrant the grant of summary judgment per se. See Wiley v. American Greetings Corp., 762 F.2d 139, 141 (1st Cir. 1985). Cross motions simply require [the court] to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed. Id. As always, we resolve all factual disputes and any competing, rational inferences in the light most favorable to the party against whom summary judgment has entered. Den Norske Bank v. First Nat'l Bank of Boston, 75 F.3d 49, 53 (1st Cir.1996).

Wightman v. Springfield Terminal Ry. Co., 100 F.3d 228, 230 (1st Cir. 1996).

**B.      Material Facts**

On March 18, 2008, Sergeant Geary of the Camden Police Department in Maine responded to a call by one of Irving's neighbors, Sarah, reporting a possible burglary at Irving's

---

[4]         The defendants admit to being a little unsure as to the parameters of the claims being pursued by Irving. (See Defs.' Reply Mem., Doc. No. 41.)  Part of this confusion stems from differences between Irving's first amended complaint and her second amended complaint.  I have concluded that it is only fair to hold Irving to her representations made on this score in the summary judgment pleadings.

home in Camden, Maine. According to Geary's affidavit,[5] when he arrived at the house he was met by Sarah. Mr. Fecteau -- the caretaker hired to watch Irving's home, collect mail, and pay bills during Irving's extended absence from Camden -- was called by Sarah and he arrived on the scene either before or shortly after Geary arrived. (At this juncture Peter, Sarah's husband, was not on the scene.) Sarah told Geary that she had a key to the residence and that Irving was traveling out of the country. Sarah indicated that she and Peter had been out for a walk in the neighborhood and had seen a small basement window at the Irving residence that was out of its frame and lying on the ground beside the house.[6] Mr. Fecteau indicated that he had a key to the premises which had been given him by Irving. These neighbors told Geary that no one had entered the residence since the discovery of the window a short time earlier. Geary checked the basement window, inside and out, and observed nothing of evidentiary value. Once inside the basement Geary could see that the window frame had a heavy coating of undisturbed dust on it and he concluded that no one had actually entered the house through the window. Geary went through the residence and did not see anything that appeared to be disturbed; the interior was neat and tidy which was not the way Geary would have expected it to look had it been burglarized. A large laptop computer, a television, and other valuables – the type of goods usually stolen in residential burglaries – were in the home and undisturbed.

Sergeant Geary did observe a filing cabinet upstairs in an office that was partially open. There were no papers scattered about the partially opened cabinet, so there was no way to tell if

[5]     Irving's attempted qualifications as to several of these statements of fact are premised on an assertion that Geary's narrative report does not include some of the details in the affidavit. There is no inherent contradiction between the two pieces of record evidence, and the affidavit is sufficient to support the factual statements. This is not a situation in which a summary judgment affidavit is filed in an attempt to contradict prior sworn deposition testimony by the same witness. Consequently, the rule of <u>Morales v. A.C. Orssleff's EFTF</u>, 246 F.3d 32, 35 (1st Cir. 2001), and <u>Colantuoni v. Alfred Calcagni & Sons</u>, 44 F.3d 1, 4-5 (1st Cir. 1994), does not apply here.

[6]     Irving denies this paragraph on the ground that the email she received from Mr. Fecteau indicated that the window had been pushed in.

it had been recently disturbed or had been left in that condition by Irving. Because there were no

obvious signs of forced entry, and the undisturbed dust around the basement window showed it

had not been used to enter the residence, it did not appear that anyone had actually entered the

house. The condition of the interior of the house, including the fact that valuable items were left

undisturbed, further supported the conclusion that no one had actually entered the house.[7]

Geary believed it was possible that someone might have pried the basement window out

as part of a plan to enter the residence but had not succeeded in getting inside. Geary reflects

that often teenagers will attempt to enter a residence if they can do so quickly and quietly, and

steal cash, alcohol, or other such readily accessible items. Geary was of the view that, even if he

was wrong and someone had entered the residence, there was a good chance the crime would

never be solved.

Irving was overseas at the time of the incident and was notified in a March 20, 2008,

email from Mr. Fecteau stating that her home and the home next door had suffered break-ins by

way of pushing in the basement windows. Mr. Fecteau suggested that the break-in was carried

out by teenagers possibly looking for cash.

On March 28, 2008, Irving emailed Chief of Police Roberts[8] (from her husband's boat

while in Namibia) to inquire about the follow-up in the investigation into her residential

burglary. In this email Irving indicated that Mr. Fecteau had reported to her that her personal file

cabinet had been forced open. Irving informed Roberts that it would be difficult for her to

determine what, if anything, might be missing from the file cabinet and also that she believed

identity theft was the object of the break-in. To paraphrase, she stated in this email that she had

---

[7] Irving faults Geary for not addressing the forced opening of the file cabinet and the missing CDs (of which the police were not informed until April 20, 2008).
[8] Irving's summary judgment record evidence consists largely of emails between herself and Camden officials.

been informed that his department thought the break-in was done by teenagers looking for cash. She informed Roberts: "I find that a bit difficult to believe, given that most people do not use cash or have it lying around their house these days." Roberts did not respond to this email.[9]

In early April 2008 Irving returned to Camden and Sergeant Geary spoke to her about the incident. Irving advised Geary that the file cabinet had, in fact, been broken into, but she did not know if any personal financial records that were inside the cabinet had been removed. When Geary suggested that Irving should contact her bank and credit card companies to notify them, she advised him that all such notifications had already been made. She had not heard from Chief Roberts prior to returning home from Namibia on April 2, 2008.

According to the defendants, approximately seven to ten days after Irving arrived home in early April 2008 she called the department[10] and Geary explained to Irving why he believed no one had entered the residence through the basement window and why he had concluded that no one had actually broken in and burglarized her residence. Irving said she agreed with Geary and stated that she believed her neighbor, Peter, had entered her house. Irving based this belief on the fact that Peter had access to a key to her house which she had previously left with him and his wife while she was away, that Peter had been present when the basement window had been discovered out of place but had not responded to the residence with his wife when the police arrived, and that at a dinner party before her departure Peter was caught looking at her Palm

---

[9] In a later statement of fact, Irving takes Chief Roberts to task for stating in an interrogatory that the first email he received from Irving was on April 20, 2008. (See Pl.'s SMF ¶ 47.) There is no genuine dispute that the first email was on March 28.

[10] The record is a little convoluted with regards to whether or not Irving informed Geary at this juncture that her CDs were missing. Geary's affidavit indicates that (between April 9 and 11) she did and that they conversed about taking steps to protect her identity. (Geary Aff. ¶ 5.) Because Irving insists that her first notification to the police of the missing CDs was in her April 20 email to Chief Roberts, I give her the benefit of that apparently disputed fact in terms of measuring the defendants' entitlement to summary judgment.

Pilot. Geary explained to Irving that, even with that additional information, there was no real evidence with which to work. Geary continued to believe that no crime had been committed.

On April 20, 2008, Irving sent an email to Chief Roberts, advising him of her discussions with Geary and reporting that she had just discovered for the first time that compact discs containing her computer back-up files were missing from her residence and reiterating that a locked file cabinet had been broken open. The defendants note that Irving had been back in town since April 2 (meaning that it took her eighteen days to make this discovery). In this email she also stated: "Sgt. Geary has concluded that there is nothing that can warrant further action in this matter, I am dissatisfied with that conclusion and am of the mind that given that my personal financial and business files have been breached, and the backup CDs from my personal computer taken, further effort should be considered." Irving wrote: "In my discussion with Sgt. Geary, I frankly indicated that for numerous reasons, I strongly believe that this was the work of a neighbor who lives across the street."

Chief Roberts forwarded this email to Lieutenant Gagne[11] and requested that Gagne follow-up with Irving.[12] Roberts did not independently respond to Irving. Specifically, because Irving was insisting upon an investigation of her neighbor, Peter, and she would not accept Sergeant Geary's view that there was no basis for such an investigation, Chief Roberts assigned Lieutenant Gagne to take over the investigation to address Irving's belief that not enough was being done by Camden police with regard to her burglary.

From April 21, 2008, through May 6, 2008, Irving corresponded with Lieutenant Gagne regarding the break-in at her residence. Gagne requested a written statement from Irving

---

[11]     Gagne is now the Chief of Police, having assumed this post when Chief Roberts retired.
[12]     As Irving points out, there is no written narrative in the email itself that reflects this directive.

detailing why she thought Peter could have been a person of interest in the Irving burglary in a response to Irving's April 21, 2008, email request that the police examine his computer.[13]

In an April 21, 2008, 12:06 p.m., response to Irving, Gagne indicates that it would be very difficult to obtain a search warrant for Peter and Sarah's computer but, should Irving provide a detailed statement in support of a probable cause finding vis-à-vis the computer, Gagne would see what could be done. Irving swiftly provided this statement via a 12:28 p.m. email. It contains eight paragraphs:

> 1) This neighbor took it upon himself last fall to collect mail from my mailbox while I was out of the country. At the time, it did not strike me as unusual, but in hindsight, it adds the reason why I believe he is responsible for missing CD's and breaking into my file cabinet;
> 2) This neighbor, while a guest in my home, opened my personal organizer (Palm Pilot) and proceeded to browse through the contents (in the middle of a dinner gathering with others present);
> 3) This neighbor had a key to my house for emergencies. He was aware that I hired another neighbor as housesitter to take care of day-to-day items.
> 4) This neighbor and his wife were the only people who knew that the basement window had blown into my basement during a wind storm last fall. This is the window that was entered in the break-in. After the alleged break-in, it was apparently he and his wife who discovered the window on the ground and alerted the housesitter;
> 5) The window that was found on the ground would be virtually impossible to remove from the outside. It is placed into the foundation from the inside. Upon discovering the window on the ground, the neighbor and the housesitter replaced it and nailed it into place before the police officer had a chance to examine it;
> 6) When the police arrived to investigate, this neighbor was absent --- only his wife came to the house during the police examination;
> 7) Virtually all the other facts collected by the police officer do not support the theory that my home was broken into by local teenagers (this is the explanation that this neighbor has embraced);
> 8) The neighbor and his wife were the only people in the neighborhood who were notified by the occupant of the house next to them (and across from me) that she would be absent for the holidays for over a week. This was the week my house was "broken into".

---

[13]    Irving writes in that April 21, 2008, 11:41 A.M. email: "I was wondering if computers belonging to the person in question can be examined. I do not believe that my personal computer was accessed. Rather, CD's containing back-up files from my computer were removed from my home office. They were unfortunately sitting on top of my desk – right next to my locked file cabinet that was broken into." (Doc. No. 28-11, Page ID No. 223.)

(See Doc. 28-11, Page ID Nos. 222-223.)  Irving also cites to an April 22, 2008, statement that echoes these assertions and includes an observation that the homes on either side of her are vacant during the winter, the neighbor across the street was on holiday, and Mr. Fecteau is not often home as he works in downtown Camden and also does house-sitting for various other clients in the Camden area.  (Doc. No. 28-12.)  Irving stresses that Gagne responded to this email on April 22, 2008, at 7:16 a.m. in an email that states, "Based on what I see at this point I do not believe that we have enough for a warrant."[14]

In an email dated May 1, 2008, at 3:35 p.m. from Irving to Gagne, that was copied to Chief Roberts, Irving offered her opinion that "this matter is not being taken very seriously by your entire department," and requesting that the investigation "be handled in a more comprehensive manner …."  (Doc. No. 35-2 at 4, Page ID No. 420.)  Gagne replied at 4:54 p.m. that day, advising Irving of his belief that there was not enough evidence to support a search warrant at that time, but that he had, nevertheless, forwarded the case report, their emails, and Irving's statement to the District Attorney's Office, and would follow up with the District Attorney.

Over the course of the next few weeks, Gagne took such steps as he thought could be taken, despite a lack of any real evidence to support Irving's conviction that Peter had stolen her CDs and breached her file cabinet.  Irving wanted these neighbors' home computer seized and subjected to forensic analysis by computer crimes task force technicians to see whether any of her CDs had ever been opened and accessed by any computer used by Peter.  Despite knowing that the District Attorney could never be convinced to apply for a search warrant from the court to seize the neighbors' computer given the lack of any supporting evidence, Gagne provided the

_____

[14]        The two exhibits she cites, Exhibits 4 and 6 to her affidavit, do not contain the email response in question.  (See  Doc. Nos. 28-11 & 28-13.) However, the full Gagne/Irving email discourse can be found at Doc. No. 35-2.  (See id. at 5.)

Knox County District Attorney with a statement that Irving had given him outlining all the reasons why she believed Peter was involved in the break-in at her house. The request was made to the Knox County District Attorney's Office that it apply for a search warrant authorizing Camden Police to seize the home computer at these neighbors' residence only because of Irving's insistence. As expected, the District Attorney's Office advised Gagne that Irving's unsupported beliefs provided no basis on which to make an application for a search warrant and it refused to pursue any such request with the court. Irving insisted that if these neighbors' computer could not be seized by search warrant, Camden Police should interview the couple as suspects in the crime.[15]

Key to weighing Irving's current assertion that it was improper for the Camden Police to conduct the interview with Peter and Sarah is the fact that in a May 2, 2008, email Irving opined:

> I don't think it is much of a stretch to see why I am getting the impression that I outlined with Chief Roberts. If the D.A.'s opinion is that the evidence does not

---

[15] Irving is correct that the defendants have not cited evidence of this search warrant request beyond the affidavit statement of Gagne. She indicates that she requested this documentation as part of discovery and nothing was produced. (Resp. SAMF ¶¶ 116, 117.) I note that an issue of third party subpoenas arose earlier in this case - involving in part:

> A Subpoena Duces Tecum was also issued by the United States District Court, District of Maine and served on [District] Attorney Rushlau by certified mail on September 11, 2010. This Subpoena Duces Tecum commanded production of a copy of an Affidavit for Search Warrant authored by Lt. Randy Gagne of the Camden Police Department, submitted to the Knox County District Attorney's Office in late April, 2008.

(Doc. No. 11 at 2.) With respect to this request, I expressed my concern during a discovery conference, "about not having the third party properly before the court and I indicated that if Ms. Irving expected me to act upon her motion to compel some further action would have to be taken by her." (Doc. No. 15 at 1-2.) On November 10, 2010, I ordered:

> As I indicated during the telephone conference, to the extent Plaintiff seeks a third-party's compliance with a subpoena issued by this court (a state court subpoena is not enforceable in this proceeding), plaintiff will have to demonstrate to this court that she has, at a minimum, complied with Rule 37(a)(1) and provided the third party with notice of the motion, and prior to filing the motion has in good faith conferred or attempted to confer with the third party. Until such time as plaintiff makes such a showing, I will not order a third party, not a defendant in this action, to comply with any discovery request. Both the plaintiff and the third party should be cognizant of the fee shifting provisions of Rule 37(a)(5) if the court is forced to deal with a subsequent motion to compel on a formal basis and other than through a voluntary telephonic hearing on the issues.

(Docket Entry 17.) Ms. Irving never again raised the issue of the third party subpoena and I do not know if she ever conferred with the Knox County District Attorney or obtained the documents she sought.

amount to probable cause, it would behoove to pay a visit to [Peter]. The story I was given was that he and his wife discovered the "break-in". Yet, he was noticeably absent to respond to questions. There are some questions that ought to be asked of him and his wife.

(Doc. No. 35-2 at 3, Page ID No. 419.) This email contained a list of questions that Irving believed should be asked of these neighbors during their interview. Included on Irving's list were questions related to their discovery of the window outside the residence on March 18, 2008, the actions they took in response, whether either of them had entered her residence using the key they had at any time during Irving's absence from January 11, 2008, to April 3, 2008, and suggesting to Peter that he might submit his computer for analysis. (Id.)

During this period of the investigation, Irving advised Lieutenant Gagne that her bank and credit card companies reported that there had been no unauthorized attempts to access her financial information or accounts. At this juncture, Gagne did not see anything that made him disagree with Geary's analysis that, in the absence of any additional evidence being discovered, there was little else that could be done at that point.

In order to try again to placate Irving's belief that Camden Police were not doing enough to try to solve her particular burglary, Chief Roberts directed Gagne to have the interviews conducted. Because Sergeant Geary was most familiar with the events of that day and had dealt with Peter, Sarah, and Mr. Fecteau, Gagne assigned Geary the task of interviewing these people.[16] Gagne provided Geary with the list of reasons Irving had provided to support her belief that Peter was involved in this crime to assist Geary in formulating questions for the interview. Via emails Lieutenant Gagne directed Sergeant Geary to conduct interviews with Sarah, Peter, and Mr. Fecteau and indicated: "This is to be done and documented, with complete reports

---

[16] I note here that there is a certain amount of redundancy in the Statement of Additional Facts set forth by the defendants once we reach the Paragraphs in the 200 series. It would be belaboring the point to delve into Irving's lengthy qualification of facts to which she had already responded.

ASAP." Under normal circumstances, Peter and Sarah would not have been interviewed as suspects in this case given the lack of any real evidence to support a reasonable belief that they were somehow involved.

Geary conducted an interview with Sarah and Peter at their home on May 5, 2008. Geary asked them about the events of March 18, 2008, because Irving insisted that the fact that they had discovered the burglary was one reason she believed Peter was responsible for stealing her CDs. In the interview, Peter and Sarah reiterated to Geary that they were simply out for a walk in their neighborhood when they saw the window on the ground. They told Geary that they decided to call police because they were aware of another break-in on the same street that had been discovered earlier in the week. During this interview Geary asked Peter if he remembered an incident in which he had picked up Ms. Irving's Palm Pilot at a dinner party. Peter advised Geary that he did recall the incident, but explained that he had simply picked up the Palm Pilot because he had never seen one and was just curious about that particular device. When Geary asked Peter if he had looked at any of Ms. Irving's personal information on the Palm Pilot, Peter told him that he had not. Geary did not learn anything in his interview of Peter and Sarah that supported Irving's belief that Peter had entered her house and stolen her CDs.

Sergeant Geary interviewed Mr. Fecteau later that same week and Geary's report is detailed with respect to Mr. Fecteau's interaction with Irving and his characterization of her behavior surrounding this event and her relationship with Sarah and Peter. When Geary asked Mr. Fecteau about Sarah and Peter, Mr. Fecteau advised him that they were upstanding citizens and that he would trust them with anything, including his own personal property. Mr. Fecteau also confirmed the truth of their statement that Sarah called him immediately upon seeing the window on the ground on March 18, 2008 and asked him to respond to the scene. Mr. Fecteau

confirmed in the interview that he waited outside with Sarah for police to arrive.[17]  Mr. Fecteau

also reiterated in his interview that his inspection of the house in the company of Sergeant Geary

on that date did not disclose anything that appeared out of place or missing.  Mr. Fecteau advised

Geary that the interior of the home looked exactly as it had the last time he had been in it, which

was only two days before he and Geary inspected it on March 18, 2008.[18]  Mr. Fecteau also

refuted any idea that Peter and Sarah should be considered as suspects.  Peter and Sarah were

long-time residents of Camden and Mr. Fecteau personally attested to their honesty and good

reputation when Geary interviewed him.

There was nothing in Sergeant Geary's interview of these three individuals that made him

suspicious that Peter and Sarah had any involvement in the CDs allegedly removed from Irving's

residence.  Under normal circumstances, neither the request to the District Attorney's Office to

apply for a search warrant to seize their computer nor an interview of them as possible suspects

would have taken place.  The only reason the search warrant was sought and the interviews

conducted was because of Irving's continued insistence that her neighbor Peter entered her house

and stole CDs containing personal information.

On May 9, 2008, Irving received a letter from Sarah, who happens to be an attorney,

threatening legal action if Irving persisted with her "unwarranted character assassinations."

(Doc. No. 28-20, Page ID No. 239.)  On the same day Irving met with Chief Roberts at the

Camden Police Department to discuss this letter.  Roberts informed Irving, "a standard and

acceptable means of interviewing a subject was to ask specific questions that clearly relate to the

reasons for suspicion."  (Doc. No. 28-21, Page ID No. 240.)

---

[17]     Irving reiterates that there is somewhat conflicting evidence as to whether Geary arrived before Mr. Fecteau responded.  This is not a material dispute.

[18]     Irving points out that this does not establish whether the drawer was opened and the file cabinet had been tampered with two days before and the caretaker had noticed that then or not.

Having exhausted what little information he had to pursue, Lieutenant Gagne concurred in Sergeant Geary's assessment that, unless something changed and/or some new evidence came to light, the Camden Police were unlikely to ever solve this crime.[19]  On or about May 9, 2008, Gagne received an email from Irving, complaining about Geary's interview of Peter and Sarah because it had resulted in her receiving a "stiff letter" from Sarah when Irving identified them as suspects to the crime.  Irving was upset that Geary had mentioned during the interview the incident in which Peter had reportedly looked at Irving's Palm Pilot while at her house.  Irving also advised Gagne that she had met with Chief Roberts earlier that day to express her upset with him as well, and had provided him a copy of the letter from Sarah.  Irving concluded her email to Gagne by saying that she was sorry that she had ever had any faith that he would conduct an "appropriate investigation" on her behalf and expressed her belief that the Camden Police Department had no interest in her case.

According to Gagne, at the time Irving expressed these beliefs in her May 9 email, Camden Police had already requested the District Attorney's Office to apply for a search warrant to seize the computer, though expecting that request would be denied because of the lack of any evidence to support it, and had interviewed her neighbors and caretaker to try to find any information besides Irving's own suspicions on which to base further investigation and action. Under normal circumstances, such actions would likely not have been pursued because of a lack of evidence to support them, but they were done in Irving's case because she was so insistent that more could be done to solve the crime.  If, based upon their interview with Geary, Sarah and Peter concluded that Irving considered them suspects in her break-in, that simply was

---

[19]     According to the defendants, the vast majority of residential break-ins like Irving's are never solved by law enforcement.

unavoidable given that the only source of the information that allegedly made them suspects was Irving.[20]

Irving and Mr. Fecteau conversed through email on May 13 about his statement made to Geary and the dispute between Irving and someone named Julie about a boundary dispute betwixt the neighbors arising from an encroachment of the latter's driveway on Irving's property.[21]

Also on May 13, 2008, Irving emailed Chief Roberts the following query:

> I wonder if you would send Sgt. Geary to my home sometime before the end of the week. I would like for him to demonstrate to me how the basement window that was found on the ground can be removed from outside my house. He has made the assertion that "no one entered her residence", "no crime has been committed" and "I believe that someone may have attempted to gain access but nobody entered the house". If not done from inside the house, the window had to be removed from the outside. Right?

(Doc. No. 28-15, Page ID No. 228.) Chief Roberts responded: "I understand that you are disappointed and dissatisfied with the results of this case. Unfortunately, I believe we have done all that can reasonably be expected on this matter. I will not be directing Sgt. Geary to meet with you. This case is closed." (Id.) [22]

---

[20] Irving stridently challenges this statement by essentially faulting the investigative work, particularly Geary's narrative report.

[21] The defendants outright object to the contents of Paragraph 27 arguing that the email relied on is rippling with hearsay. They also think the boundary dispute is immaterial to the present complaint. Although it is a bit incongruous, I have left it in the factual recital because Irving raised it. Quite honestly, given the overall complexion of this case, I am not sure why the defendants thought that this somehow disfavored their defense. I am also unsure why Irving thought this email exchange with Fecteau advanced her case.

[22] Irving includes evidence of a June 26, 2008, police investigation into another burglary attempt in Camden which included a K-9 unit and two Maine State Police troopers. She notes that there were fifteen pieces of evidence collected including a DNA sample for profiling. She also points out that there were very detailed narratives by Camden police officers as compared to her case. (See Doc. No. 28-22.) The defendants respond with a relevance challenge and point out that this incident had a significantly different complexion than did Irving's. I have ordered Doc. No. 28-22 sealed because it contains personal identifiers relating to a woman who was home alone at the time of the unlawful entry into her home. Neither the case nor this complainant has anything to do with this lawsuit and the matter should not be part of the public record.

*Interactions with Town Manager Roberta Smith*

On May 9, 2008, Irving emailed the town manager, Roberta Smith, to inquire about the avenues for submitting a complaint about the Camden Police Department's handling of the investigation of the break-in of her residence. Smith responded on May 12 directing Irving to start by contacting the Chief of Police. It is Smith's practice to refer any complaining citizen to the department head responsible for the subject matter of the complaint. That day Irving replied to Smith that she had discussed the matter with him and did not find it beneficial. She indicated that she was going to be discussing the matter with an attorney towards determining how to proceed and that she would get back in touch with Smith after that meeting. Smith promptly forwarded this email chain to Chief Roberts, stating "there must be a story here." [23]

The next day Irving emailed Smith to inquire if she had discussed the matter with Chief Roberts. Smith had not had a chance to speak with Roberts at that point, although she later discussed the case briefly with him. Approximately a week later, Irving reached Smith by telephone because she had not had a response to her May 13 email. Irving requested a meeting with Smith to discuss how Irving could submit a complaint about the police department.

For their part, the defendants rely on Paragraph 1 of Smith's Affidavit that states:

> On or about May 9, 2008, I received an e-mail from Linda Irving inquiring about how she could lodge a complaint concerning the manner in which the Camden Police Department had handled an investigation of a break-in at her residence. On or about May 12, 2008, I replied via e-mail to Ms. Irving, asking her to start by talking to Police Chief Phil Roberts. My practice is to refer any complaining citizen to the department head of the department involved in the subject matter of the complaint. Ms. Irving responded that she had already discussed her

_____

[23]   Irving challenges Chief Roberts on this issue, noting in a subsequent statement of fact that his interrogatory answer included a response that he did not remember receiving this email. There is no genuine dispute that the email was sent to him from Smith.

   Roberts answer to Interrogatory 15 indicates that he did recall discussing with Smith the policy regarding complaints against an officer but also indicating that there was no such policy for filing complaints against the department in general or with respect to an investigative process. (See Doc. No. 28-28 at 7, Page ID No. 300.) He indicates that he did not have the impression that Irving was pursuing her option to file a complaint against a particular officer.

dissatisfaction with Chief Roberts in person and did not find that meeting "beneficial." Ms. Irving also advised that she was going to be discussing this matter with an attorney for advice about how to proceed, and would be back in touch with me after that meeting. On or about May 13, 2008, I received another e-mail from Ms. Irving asking if I had had a chance to review her case with Chief Roberts. I had not had a chance to speak with him at that point, though I later discussed the case briefly with him. Ms. Irving called me on the telephone before I had a chance to reply to her latest e-mail. I told Ms. Irving that Chief Roberts informed me that the only thing allegedly taken in the break-in was a computer disk, that Ms. Irving had not provided the police any specific information about what was on the disk, that there was some issue regarding a neighbor of Ms. Irving's, and at that point, approximately two months following the burglary, Chief Roberts believed there was nothing more that could be done and essentially considered the case closed. At that point, there really was no point in meeting with Ms. Irving myself, as it seemed her real complaint was simply that the police had not done enough to solve her burglary and I had to defer to the police regarding what action they deemed necessary and appropriate in their investigation. That telephone call and follow up to Ms. Irving's e-mails were the only contact I had with her.

(Smith Aff. ¶ 1, Doc. No. 34.)  According to Irving, Smith did not disclose to her any details of what Chief Roberts had reported to Smith.  (Irving Aff. ¶¶ 25-29.)  With respect to the assertion that there really was no point in a meeting between Smith and Irving, Irving complains of this "refusal" of a meeting to air the facts and content of the complaint that Irving wished to make. She protests that Smith did not direct Irving to a town policy that was allegedly in place regarding complaints about law enforcement.  She describes the cited reasons for refusing to meet with Irving or to provide instruction about submitting a complaint as being based entirely on conjecture because she was not afforded the opportunity to specify or elaborate on her request.

The Camden Police Department (and the Town of Camden) currently posts instructions on its website for making complaints regarding law enforcement.[24]  Part of this document states

---

[24]     Irving sets forth three paragraphs describing Maine statutory provisions 25 M.R.S. § 341 invoking Maine Criminal Justice Academy Board of Trustees standards for addressing citizen complaints. (See Pl.'s SMF ¶¶ 39-41; Doc. No. 28-23.)  Similarly, Irving advances statements pertaining to the Maine Chief of Police Association (Chief Roberts having held positions on that board) that relate to citizen complaints. (Pl.'s SMF ¶¶ 42-43.)

that if an individual wished to make a complaint regarding the actions of an employee or about other aspects of law enforcement operation,[25] that person should come to the agency and tell any employee about the desire to make a complaint or call the agency or the town/city/county's manager office and inform the person answering the phone of a wish to make a complaint. (See Doc. No. 28-24.) The document states: "A supervisory employee will assist you in filling out a report of the complaint against law enforcement personnel form. This form asks you to identify yourself and then to give the specific details about your complaint." (Id. ¶ 2.)[26]

Between May 1, 2001, and December 13, 2010, twenty-six complaints were addressed to the Camden Police Department. (See Doc. No. 28-28; Page ID Nos. 297-298.) These complaints cover a wide swath of disgruntlement with police action or inaction. As the defendants point out this is a diverse range of complaints that both preceded and followed the Irving interactions. None of these complaints -- based on the evidence upon which Irving herself relies -- actually is similar to the grievances Irving holds about the investigation of her break-in. They are related to traffic stops, the enforcement and non-enforcement of parking limitations, the operation of police vehicles observed by citizens, the non-emergency use of the fire horn, and the like. For what it is worth, at the times relevant, Irving had no personal knowledge of the statute-mandated minimum standards or the Camden Police Department's policy for lodging complaints relative to the actions of an employee or about law enforcement in Camden.[27] Irving, who is demonstrably computer savvy and has submitted the policy from the website along with a screen

---

[25]    Although the defendants assert that these provisions are irrelevant to Irving's claims, I note her citation because if Irving actually could demonstrate that these standards are selectively followed by the defendants it could be somewhat material to an equal protection theory.   She never makes any such showing.

[26]    (See Pl's SMF ¶¶ 50, 51.)

[27]    Smith relayed in her interrogatory answer that it was her understanding that there was a requirement that the complaint be filed with a supervisory law enforcement person.

[27]    Irving insists that under the town's charter Smith had a duty to "assist, insofar as possible, residents and taxpayers in discovering their lawful remedies in cases involving complaints of unfair vendor, administrative and governmental practices."   However, the record citation on which she relies is inapposite.

grab of its location, does not indicate that she ever attempted to file a complaint on this form.  It seems that Irving believes that there was a proactive duty on the part of Roberts and Smith to provide her with the form even though she had informed them that she was seeking an attorney to assist her in investigating her complaint.

Rather than filing her form complaint with the Town of Camden, on May 28, 2008, Irving corresponded with Brian MacMaster, Chief of the Investigation Division of the Maine Attorney General's Office, requesting information regarding her "right to an appropriate and fair investigation by the town police department," and representing that the Camden Police Department "did not take any initiative to investigate the case."  At the time of her letter to Mr. MacMaster, Irving's complaint for which she sought "an appropriate investigation" by the Attorney General was about the way in which the interview of Peter and Sarah had been conducted, which resulted in her receiving a letter from Sarah.  Irving's letter opens:  "I am writing to request information regarding my right to an appropriate and fair investigation by the town police department in Camden."  (Doc. No. 35-3, Page ID No. 426.)  Near its end Irving queries: "Would such a case be reviewed by the Investigation Division of the Attorney General's Office?  If not, could you assist me in determining where I may have the matter heard?"  (Id.)

According to the defendants, Irving concedes that she had the opportunity to meet in person with Chief Roberts to air her complaints about the letter she received from Peter and Sarah following their interview by the police.[28]  There is no dispute that Irving has never been the subject of a legal action by Peter and/or Sarah as a consequence of the investigation at issue here.

_____

[28]        Irving insists that at no time during this meeting with Chief Roberts did he offer to take a witness complaint, nor did he advise Irving that there was a policy for filing a complaint assuming he believed that Irving was wishing to submit a complaint at the time of the meeting.  She relies on Exhibit D to her affidavit which is a supplemental narrative by Roberts, while indicating that this report speaks for itself.  (Doc. No. 28-21.)  The report actually does not affirmatively speak to the absence of assistance by Roberts as characterized by Irving.

### *The Select Board and Attorney Kelly (SAMF ¶¶ 163-170)*[29]

On October 10, 2008, Irving sent a letter to the five members of the Select Board of the Town of Camden asking the Select Board to review issues she had with both Town Manager Smith and the Camden Police Department. Irving advised the Board that she had already exhausted attempts to involve the Maine Attorney General's Office in this matter. As a result of Irving's complaint, the Select Board decided to retain an attorney, William Kelly of Belfast, to investigate Irving's complaints about the way the investigation of her burglary was handled by the Camden Police Department, as well as her complaints against Town Manager Smith for her initial review of Irving's complaints. In response, Irving filed a complaint with the Board of Bar Overseers against Attorney Kelly, accusing him of engaging in a conflict of interest. After that issue was resolved in Attorney Kelly's favor by the Board of Bar Overseers, he conducted an independent investigation of Irving's complaints, as the Select Board directed. At the conclusion of his investigation, Kelly submitted a report to the members of the Select Board, which report was also provided to Irving. Attorney Kelly concluded that nothing in Irving's complaint rose to a level which required any further action or any discipline of any Town of Camden employee.

When Irving sent a written complaint about Attorney Kelly's investigation and his conclusions to the Select Board, Select Board Chairman John French and Select Board member Deborah Dodge met personally with Irving to try to address her ongoing complaints.

---

[29]     Irving takes umbrage at the inclusion of these facts pertaining to the Select Board and Attorney Kelly on the grounds that they are immaterial to her claims. She points out that she has not sued the Board or Attorney Kelly. She focuses on the fact that her communications were initiated five months after the key events of her complaints against the three named defendants. (Resp. SAMF ¶¶ 163, 164,165, 166, 167, 168, 169, 170, 199.) She insists that Attorney Kelly's review of a citizen complaint is immaterial, irrelevant, and not within the purview of the role of the Select Board and the town charter's provision for investigating the affairs of the town. Irving interprets the Board of Overseers conclusion to be that Attorney Kelley owed a duty to the town and not to citizens such as herself.
     What she seems to overlook is that this history is not entirely immaterial to her claims against the town or her official capacity claims and the defendants would be reckless if they presented a summary judgment motion on their own behalf without addressing the full history of the interactions relevant to their potential liability.

*Facts Relating to the Subsequent Arrests of Young Men for the Street Burglaries (SAMF ¶¶ 171-208)*[30]

In December 2008, Camden Police were contacted by Maine State Police with regard to multiple burglaries that had occurred in Camden during the winter of 2007-08. Maine State Police advised that they had several suspects who had admitted to taking part in burglaries throughout Knox and Lincoln Counties. This group of young men had identified burglaries at four homes on a particular street in Camden, including Irving's residence, as well as a pizza parlor in Camden, as among the crimes they had committed. Two other residences in Camden later were also identified as properties that had been entered.

Maine State Police had interviewed suspects Andrew Blauvelt, Todd Farley, and a juvenile, who had admitted to multiple burglaries in Knox and Lincoln Counties. Farley admitted that he and Blauvelt had burglarized homes on Irving's street, but was not sure whether they had entered the homes at number 4 and number 6 on that street. Blauvelt, however, advised Maine State Police that the group had gone into No. 4 and No. 6, Irving's residence being at No. 6.

On or about December 11, 2008, Lieutenant Gagne spoke with Attorney Daniel Purdy, representing Andrew Blauvelt, who gave Gagne permission to speak to his client directly about any of the burglaries in Camden. Blauvelt had already implicated himself in the Camden burglaries while being investigated by the Maine State Police for other crimes, and at this time Attorney Purdy was trying to negotiate a plea bargain with the District Attorney's Office that would include all of the burglaries in which Blauvelt had participated. On December 18, 2008,

---

[30]  Similar to her response to the facts set forth regarding the Select Board, Irving contends that facts related to this investigation are immaterial and should be stricken because this activity occurred seven to fifteen months after the conduct of which she complains and pertain to individuals and entities not a party to her suit. (Resp. SAMF ¶¶ 171, 172, 173, 174,178, 180, 181, 182, 183, 184, 185, 186, 187, 188, 189, 190, 191, 192, 193, 194, 195, 196, 197, 198, 200, 201, 203, 204, 205, 207.) She also insists that interviews conducted and actions taken by the Maine State Police are irrelevant to her claims in the second amended complaint. (Resp. SAMF ¶¶ 175, 176, 177, 179, 207.)

Chief Roberts and Gagne met with Andrew Blauvelt at the Camden Police Station. Blauvelt was advised of his legal rights and was told he was not in custody and free to leave at any point. During this interview, Blauvelt indicated that he and the others had entered two residences on Irving's street and he provided details about both residences. Blauvelt indicated his belief that the only things that were taken from Irving's residence were a couple bottles of Vodka. Blauvelt said that, once inside a residence, the group looked only for money and alcohol. Blauvelt admitted to going upstairs in the residences to look in drawers in bedroom furniture because people often kept money there. Blauvelt also indicated that he may have entered a file cabinet or a wooden desk at one of the residences. Blauvelt said that he did not remember a computer at either of the residences that he entered and specifically denied that he had taken any computer CDs from any residence.

After conducting the interview at the police station, Lieutenant Gagne took Blauvelt to Irving's street, where he identified numbers 4 and 6 as homes he had definitely entered. Once at the residences, Blauvelt remembered more details about the crimes. Blauvelt advised that he had entered Irving's residence by using a credit card to open the rear door. Blauvelt did not attempt to gain entry through the basement window, but thought the other men might have tried that while he was checking the doors. Blauvelt identified the Irving residence as the one where he believed he entered a file cabinet or wooden desk inside the residence and indicated that he believed he used a hammer he found in the residence to break into it because it was locked. Blauvelt again stated that bottles of Vodka were taken from this residence,[31] but no computer CDs. Blauvelt also accompanied Gagne to other addresses in Camden that had been burglarized during this same period and provided details about those burglaries as well.

---

[31]     Irving maintains that there was no vodka in the house, only wine in the refrigerator.

Lieutenant Gagne did not receive any authority from the attorney representing Todd Farley to speak with him, so was unable to interview him about the burglaries. Any information that prosecutors received from Farley about the burglaries came to them as a result of his discussions with Maine State Police and not from the Camden Police Department. On March 9, 2009, Todd Farley was indicted by the Knox County Grand Jury on an 18-count indictment charging him with, among other crimes, the burglary at Irving's residence on March 18, 2008. On March 9, 2009, the Knox County Grand Jury returned a 24-count indictment against Andrew Blauvelt that included the March 18, 2008, burglary at Irving's residence.

After follow-up correspondence between Select Board Chairman John French and Irving throughout March and April 2009, the Select Board concluded its review of Irving's complaints. On August 26, 2009, Andrew Blauvelt pled guilty to, among other crimes, the March 18, 2008, burglary at Irving's residence. On July 24, 2009, Todd Farley pled guilty to, among other crimes, the March 18, 2008, burglary at Irving's residence.

Although the active portion of Gagne's investigation of Irving's burglary was essentially closed in May 2008 due to a lack of any evidence on which to base further investigation and/or action, the burglaries in Camden during that period were still considered open, unresolved crimes. When Camden Police received information in December 2008 of evidence obtained by Maine State Police linking Blauvelt and Farley to burglaries in Camden, in addition to other towns in Knox and Lincoln County, Gagne followed up on this information with Maine State Police.

The defendants assert, relying on conclusory passages in their affidavits, that at all times Sergeant Geary, Lieutenant Gagne, and Town Manager Smith treated Irving as they would any other citizen of Camden in their particular capacities. (SAMF ¶¶ 209-11.) As Irving remarks,

these statements are "vague and subjective and without any authority other than citation from []
self-serving affidavit[s]." (Resp. SAMF ¶¶ 209, 210.)[32]  Finally, Irving insists that whether Peter
actually committed a burglary of her residence is irrelevant and that her belief about the
circumstances has no bearing on whether she was deprived of her rights.  (Resp. SAMF ¶ 206.)[33]

## C.    Irving's Four Claims as Stated in her Second Amended Complaint (Doc. No. 20)

### 1.    *Violation of Civil Rights – Equal Protection of the Laws under 42 U.S.C. 1983*

Irving's first cause of action in her second amended complaint is entitled "Violation of

Civil Rights – Equal Protection of the Laws under 42 U.S.C. 1983."  (2d  Am. Compl. at 12.)  In

this claim Irving focuses on Town Manager Smith, summarizing:

> After forwarding and discussing Plaintiff's email requests with Chief Roberts,
> Ms. Smith did not respond to emails from Plaintiff and refused to meet with
> Plaintiff to explain how to make a complaint about law enforcement in Camden.
> This refusal to provide Plaintiff with the appropriate instruction for submitting a
> complaint about law enforcement shows deliberate indifference to the possibility
> of misconduct by law enforcement officers**.** This intentional denial of the
> opportunity for Plaintiff to make a complaint against law enforcement also
> demonstrates the failure of Ms. Smith to exercise reasonable care in supervising
> Chief Roberts. This failure to supervise was carried out by Ms. Smith in her
> individual capacity and her official capacity as final policy maker and chief
> executive and administrative officer of the municipality. Ms. Smith deprived
> Plaintiff of her 14th Amendment right to Equal Protection of the Laws by her
> **Failure to Supervise** Chief Roberts and **Selective Enforcement of the Laws**
> (Maine Statutes, Title 25, Chapter 341, 2803-B, 1(G)).

(Id. ¶ 47.)

### 2.    *Violation of Civil Rights – Equal Protection of the Laws 42 U.S.C. 1983 and Depriving Persons of Rights and Privileges 42 U.S.C. 1985*

---

[32]     With regards to Town Manager Smith, Irving contends that her request for information on how to file a
complaint about the police department could have been readily responded to by following a policy allegedly in place
that complied with statutory minimum standards. (Resp. SAMF ¶ 211.)
[33]     In her second affidavit Irving states: "At this time, I do not have any specific belief about who was
primarily responsible for burglarizing my home, because there have been numerous conflicting assertions made by
various parties, none of which explains facts that I know to be true." (2d Irving Aff. ¶ 30, Doc. No. 40.)

The second claim advanced by Irving is framed as one brought as an equal protection claim under the Fourteenth Amendment via 42 U.S.C. § 1983 and a civil rights conspiracy claim pursuant to 42 U.S.C. § 1985.  Irving explains:

> On May 12, 2008 Defendants Ms. Smith in her personal and official capacities and Chief Roberts in his personal and official capacities entered into a conspiracy to intentionally deprive Plaintiff of her 14th Amendment Constitutional right to Equal Protection of the Laws by **Failure to Supervise and Selective Enforcement of the Laws** and **Deprivation of Rights and Privileges** (42 U.S.C. 1985)**.** Their refusal to provide Plaintiff with the appropriate instruction for submitting a complaint about law enforcement shows deliberate indifference to the possibility of misconduct by law enforce[e]ment officers**.** Their failure to take a citizen complaint is selective enforcement of the laws (Maine Statutes Title 25, Chapter 341, 2803-B, 1(G)) and ratifies the malicious conduct of Sgt. Geary which resulted in harm to Plaintiff. Chief Roberts failed to exercise reasonable care in supervising law enforcement personnel.

(2d Am. Compl. ¶ 50.)

### 3.   *Violation of Civil Rights – Equal Protection of the Laws under 42 U.S.C. 1983*

The third cause of action set forth in Irving's second amended complaint is described as equal protection/Fourteenth Amendment/ 42 U.S.C. § 1983 claims and focuses on the supervisory responsibilities of Chief Roberts over Sergeant Geary.   "Chief Roberts did not follow up on this unconscionable letter written in response to a bad faith retaliatory witness interview undertaken by Sgt. Geary,"  Irving alleges.  (2d Am. Compl. ¶ 51.)  She continues: "This lack of concern and action by Chief Roberts ratified Sgt. Geary's conduct."  (Id.)  Irving submits:

> The burglary case was closed in May 2008 by Chief Roberts, despite confusion about evidence and conclusions made by Sgt. Geary that contradicted evidence. Chief Roberts' failure to accept a citizen complaint ratifies the misconduct of Sgt. Geary and demonstrates selective enforcement of the laws and failure to exercise reasonable care in supervising Sgt. Geary, ultimately resulting in inordinate threats against Plaintiff who was a victim of a crime. This failure constitutes deliberate indifference to the Constitutional Rights of Plaintiff. In his individual capacity and official capacity as final policy maker for the Camden Police Department, Chief Roberts engaged in the willful deprivation of Plaintiff's

14th Amendment Constitutional Rights to equal protection of the laws by **Failure to Supervise and Selective Enforcement of the Laws** (Maine Statutes Title 25, Chapter 341, 2803-B, 1(G)).

(Id. ¶ 52.)

### 4. *Violation of Civil Rights – Failure to Supervise 42 U.S.C § 1983*

Irving's final and fourth cause of action presses a 42 U.S.C. § 1983 claim targeting the Town of Camden. She explains her theory in the following manner: "The Town of Camden was the overarching Defendant employer responsible for the actions of all other named Defendants who acted as final policy makers for the Town of Camden in this Complaint." (2d Am. Compl. ¶ 53.) "As such," Irving theorizes, "Defendant Town of Camden is a responsible party in the injuries occasioned by the above-referenced Causes of Action 1, 2 and 3 violation of Plaintiff's 14th Amendment Right to Equal Protection of the Laws by all other Defendants therein in their official capacities of Town Manager and Chief of Police." (Id.)

### D. *Legal Analysis of the Claims*

At first glance, Irving's statements of claims in her Second Amended Complaint implicate the equal protection clause of the Fourteenth Amendment, civil rights conspiracy liability under 42 U.S.C. § 1985, supervisory liability, and municipal liability. The individual defendants have pressed a defense of qualified immunity. However, in her reply memorandum Irving insists that she is asserting that the non-defendant officers violated her First Amendment rights and, because she perceived that she could not sue them,[34] she is suing these defendants on a theory of failure to supervise as required by the Fourteenth Amendment resulting in the

---

[34] It is not clear to me how Irving arrived at the conclusion that she could not sue Sergeant Geary and Lieutenant Gagne in their individual capacities. However, the defendants try to suggest that in order to proceed with these supervisory claims against individuals and policy and custom claims against the municipality Irving would have to necessarily include these two as named defendants. It is true that on both theories of supervisory liability or municipal liability it is Irving's responsibility to prove an underlying constitutional violation, in this case by Geary and/or Gagne, but this does not mean that she has to include them as defendants to her suit. See cf. Fletcher v. Town of Clinton, 196 F.3d 41, 55 -56 (1st Cir. 1999).

25

violation of her First Amendment rights. Irving insists vis-à-vis Town Manager Smith and Chief

of Police Roberts "the actual Causes of Action are Fourteenth Amendment Failure to Supervise."

(Reply Mem. at 5, Doc. No. 37.)[35]

There is no discreet, abstract Fourteenth Amendment right to have state actors supervise

their employees to assure that they do not violate rights promised by the United States

Constitution. This holds true for complaints seeking to hold supervisors or a municipality liable.

The plaintiff must establish that there was an underlying violation of his or her rights under the

constitution. As I have cross motions for summary judgment before me, one option is for Irving

to carry her burden in her own motion for summary judgment establishing that there is no

genuine dispute of material fact that there <u>was</u> a constitutional violation by an individual over

whom Smith and/or Roberts had supervisory responsibility and that there was an 'affirmative

link' between the behavior of the subordinate and the action or inaction of Smith and Roberts

that inexorably led to a constitutional violation. See <u>Maldonado v. Fontanes</u>, 568 F.3d 263,

275 (1st Cir. 2009). The other option for Irving is to successfully create a genuine dispute of fact

material to this same inquiry in response to the defendants' motion, thereby demonstrating that,

in view of the nexus between the facts and the law, issues remain for trial.

### *1.    Irving's summary judgment articulation of her third and fourth causes of action- Chief Roberts and the Town of Camden[36]*

---

[35]    Having addressed countless cases involving <u>pro se</u> civil rights cases I must reject Irving's suggestion the counsel for the defendants in this case has given false interpretations of her causes of action or has acted in bad faith to create a mire of the factual and legal record. (Pl's Reply Mem. at 7.) Irving has unusual competence as a <u>pro se</u> plaintiff and her pleadings have been articulate. However, her theory of these defendants' liability is not easily ascertainable from the Second Amended Complaint. Defense counsel was simply trying to translate her claims into potentially tenable theories of liability. Because Irving is now insisting that her theory of liability is a Fourteenth Amendment failure to supervise employees to prevent violations of First Amendment rights there is nothing for the court to do other than address the facts and law under that theory. Irving has made it absolutely clear that she is not alleging any due process violations. Her claim now appears to center on the alleged First Amendment violation caused by Geary's interview of Sarah which resulted in the Irving's receipt of the letter which chilled her speech rights.
[36]    I address the third and forth claims first as that is what Irving chose to do in her summary judgment pleadings.

Irving acknowledges that police departments are not obligated to any individual citizen to investigate a crime but insists that once there is a police response they are obliged to do so without discrimination.  (Pl.'s Summ. J. Mem. at 6, Doc. No. 27-1.)  She states that she exercised her First Amendment rights when she informed the Police Department that she did not agree with Sergeant Geary's opinion that no crime had been committed, nobody entered her home, and that nothing could be done.  (Id. at 6-7.)  She faults Geary for his lack of documentation of his investigation and criticizes the perceived insufficiency of detail in his synopsis.  (Id. at 7.)  She maintains that Geary undertook a bad faith/malicious interview with Sarah and Peter with the intent of chilling Irving's speech, that is, Irving's disagreement with Geary's theories and conclusions.  (Id.)  She further faults Geary for his documentation of the interview with Mr. Fecteau which she describes as focusing on her (id.) rather than advancing the course of the investigation she envisioned.  Irving sets forth the standard for a First Amendment retaliation claim and insists that Sarah's letter as an officer of the court would chill even the most firm individual.  (Id. at 7-8.)  "Chief Roberts," Irving proceeds, "deliberately and actively ratified Sgt. Geary's malicious and retaliatory conduct in a meeting with Plaintiff, documented in his narrative report.  The harm to Plaintiff is obvious."  (Id. at 8.)  Irving further opines, "Chief Roberts' characterization of Geary's interview as a standard and acceptable means of conducting an interview further chilled Plaintiff's speech with regard to concerns expressed by her about Sgt. Geary's interview."  (Id. at 9.)  She asserts that the inaction of Roberts placed her in "the precarious position of having to reconcile legal threats made by an attorney neighbor and the subsequent refusal by Ms. Smith and Chief Roberts to assist her."  (Id. at 10.)

Now that it is clear that Irving is focusing on the interview of Peter and Sarah by Geary as the key underlying harm set forth in these two counts, it must be stressed that Irving herself

insisted that certain questions be asked of these neighbors, questions related to their discovery of the window outside the residence on March 18, 2008, the actions they took in response, and whether either of them had entered her residence using the key they had at any time during Irving's absence.  It is startling inconsistent for Irving to now blame the Camden Police for having followed through with the interviews despite the concern that there was a questionable basis for doing so.  There is no evidence that links Geary with the letter by Sarah other than the fact of the early May interview that was driven by Irving's insistence.  Irving's is a completely untenable theory of First Amendment retaliation.  See Tatro v. Kervin, 41 F.3d 9, 18 (1st Cir. 1994) (First Circuit applies a "but for" standard of proof in § 1983 actions alleging First Amendment violations by a police officer).  There is no evidence to support any reasonable inference that Geary would not have undertaken the interview "but for" the fact he knew that doing so would cause Sarah to write a letter that would be perceived by Irving as "chilling" her First Amendment rights.  Without a constitutional violation by Geary, Irving's supervisory and municipal liability theories simply crumble.

Furthermore, the summary judgment record does not even support any reasonable inference that Geary's interview with the neighbors would have chilled a person in Irving's position First Amendment speech, a conclusion fortified by the record of Irving's forthright actions taken subsequent to receiving the letter from Sarah.  See, e.g.,  Bennett v. Hendrix, 423 F.3d 1247, 1250 -51 (11th Cir. 2005); Mendocino Environmental Center v. Mendocino County, 192 F.3d 1283, 1300 (9th Cir. 1999). Irving circumvented the Camden policy for filing citizen complaints that was certainly available to her via the Town's internet site (she is, after all, a computer savvy person that managed to send an email from a vessel off the coast of Namibia to Chief Roberts shortly after the reported break-in).  This record simply does not support a

reasonable inference that she was discriminated against by the named defendants or those under their supervision because she proposed that her neighbor Peter was out to steal her identity and that they actually followed up on these suspicions through the DA and the interview process despite their concerns that there was no reasonable law-enforcement justification for doing so. In addition, Irving has not set forth facts in this record that justify any inference that Roberts (or Geary) was motivated by retaliation against Irving because of her First Amendment activity. See Crawford-El v. Britton, 523 U.S. 574, 588-89 (1998). And as Irving is targeting Chief Roberts for his failure to supervise Geary, Irving has not generated any plausible dispute of material facts that could justify sending such a claim to trial. Assuming supervisory liability still is a tenable liability standard in the wake of Iqbal, see Santana-Castro v. Toledo-Davila, 579 F.3d 109, 116 n. 5 (1st Cir.2009); Maldonado, 568 F.3d at 275; see also Morris v. Ley, No. 08-2459, 2009 WL 1784081, 3 (7th Cir. June 24, 2009), clearly mere knowledge, after the fact, of a subordinate's supposed wrongful conduct does not establish 42 U.S.C. § 1983 liability for a supervisor. Rather, there must be an affirmative link between the conduct of the supervisor and the supposed constitutional deprivation experienced by Irving. See Sanchez v. Pereira-Castillo, 590 F.3d. 31, 49 (1st Cir.2009); Maldonado, 568 F.3d at 274-75.

With respect to the Town of Camden, it is Irving's theory that Chief Roberts was the policy maker on behalf of the Town when it came to the manner in which Geary conducted his interviews with Sarah and Peter, thus, leading to municipal liability. (Id. at 10.) Based on the discussion above, it is obvious that the Town of Camden cannot be held liable on the facts of this case; there must be a "direct causal link between a municipal policy or custom and the alleged constitutional deprivation." City of Canton v. Harris, 489 U.S. 378, 385 (1989); Burrell v. Hampshire County, 307 F.3d 1, 10 (1st Cir. 2002). Irving has not created a genuine dispute that

there was a constitutional deprivation related to Geary's interactions with Irving or his subsequent interview of Peter and Sarah that was triggered by Irving's own insistence that Peter be questioned. The municipality cannot be said to have a policy or custom related in any way to the unique factual circumstances of this particular case.

### 2. Summary judgment articulation of Irving's first and second claims against Town Manager Smith and Chief Roberts including the alleged civil rights conspiracy[37]

As for her first and second claims, it is Irving's theory that Town Manager Smith and Chief Roberts conspired by refusing to provide her with appropriate instructions to submit a citizen's complaint about the Camden Police Department. (Pl.'s Summ. J. Mem. at 11.) She cites the Maine Criminal Justice Academy Board of Trustees minimum standards. (Id.) The statutory provision cited by Irving does require all law enforcement agencies to adopt written policies regarding, among other things, "[c]itizen complaints of police misconduct[.]" 25 M.R.S. § 2803-B(1)(G). It is not in dispute that Camden has such a process. Irving opines: "It was incumbent on Chief Roberts to provide Ms. Smith with the appropriate information to fulfill minimum standards in responding to Plaintiff's enquiry that was forwarded him via email. Chief

---

[37] Irving has also asserted a 42 U.S.C. § 1985 conspiracy claim. The theoretically applicable provision of that civil rights statute provides:

Depriving persons of rights or privileges

If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws….in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3). Based on Irving's own factual presentation there is no reason to belabor the notion that there was some sort of conspiracy between Smith and Roberts aimed at violating her civil rights.

Roberts knowingly and unreasonably failed to fulfill this responsibility. Ms. Smith is liable for her failure to supervise Chief Roberts." (Pl.'s Summ. J. Mem. at 11.)[38]

Irving has completely disavowed a due process theory of recovery but she cannot have her cake and eat it too. The record before this court -- which Irving has had a full opportunity to dispute and dissect -- is that there is not a trial worthy issue that she was in some way deprived of her First Amendment or equal protection rights because Smith and Roberts did not proactively hand over the forms for a citizen's complaint per the town's policy after her discussion with them. Irving wants the court to turn a blind eye to the process she was given, more process than most other complainants on this record, and tries to isolate events pertinent to her early discontent with the response to her initial complaints.[39]

The defendants have forwarded facts supported by record evidence that the Town of Camden does have a well-used process for citizen complaints concerning allegations of police misconduct. I can discern no constitutional infirmity with the response under the state-mandated provision cited by Irving. Furthermore, Irving has not established that Town Manager Smith had any supervisory responsibilities with respect to Chief Roberts. The defendants point out that the Camden Select Board is responsible for this supervision and the record is that the Board instituted and completed a thorough investigation as a consequence of Irving's complaint. There is no dispute that Chief Roberts, in a general sense, had supervisory responsibility vis-à-vis

---

[38] I take Ms. Irving at her word that she means to somehow attribute cross-supervisory responsibilities to Smith and Roberts, even though Irving seems to be primarily challenging Smith for a failure to supervise Roberts. Certainly there is no record evidence that Roberts has supervisory obligations over the town manager.

[39] Constitutional rights under the First Amendment, the equal protection clause, and the due process clause are not necessarily created by state statutes or municipal ordinances and procedures. See Chiplin Enterprises, Inc. v. City of Lebanon, 712 F.2d 1524, 1528 (1st Cir. 1983) ("A mere bad faith refusal to follow state law in such local administrative matters simply does not amount to a deprivation of [a constitutional right].") Citizen discontent is part and parcel of the day-to-day running of any town. In this case the citizen's complaints about an unfortunately rather ordinary report of a possible break-in festered into a full-blown drama. Whether the Town followed Criminal Justice Academy standards in dealing with the complaint is really beside the point in assessing whether these three defendants violated any of Irving's federal constitutional rights.

Sergeant Geary and Lieutenant Gagne.  However, there is a complete disjuncture between the facts relating to the supposed constitutional violation pertaining to the citizen complaint procedure and Geary's and Gagne's interactions with Irving during what was a noticeably active investigation between March and May 2008, with a sequel commencing in December of that year when other suspects were identified.  Even if Irving had not disclaimed the relevance of the other investigations into similar crimes, the proceedings with the Board of Selectmen, and the investigation, arrest, and convictions of the young men who accepted responsibility for the break-in, there is no evidence of equal protection infirmity with regards to a non-First Amendment theory of discriminatory law enforcement practices.

With regards to municipal liability for an alleged rights-violating policy or custom, in her reply memorandum Irving forwards cases concerning supervisory 'ratification' that is extremely tenuous in the post-Ashcroft v. Iqbal, 556 U.S. __, __, 129 S.Ct. 1937 (2009) legal climate. (See Pl.'s Reply Mem. at 3-4.)[40]  Even if I were to address her logic along the pre-Iqbal lines that she envisions, Irving has in no way carried her summary judgment burden on the cross motions apropos municipal liability.  I reiterate, there is no genuine disputes of fact material as to whether there was a constitutional violation that could give rise to such indirect liability.

### Conclusion

In summary, because of the overall tenor of Irving's pleadings and the discovery disputes that have arisen, I offer the following overview.  Irving's legal theory of her case during the course of this litigation is disjointed and has made it difficult for the defendants and the court to keep track of her proposed prospects of attaching liability to her three selected defendants, although her facts have remained very consistent.  I do not suggest that Irving has intentionally

---

[40]    Despite her full disavowal of a due process theory Irving is relying on case law  -- Zinermon v. Burch, 494 U.S. 126 (1990)  being a prime example -- that springs there from.

adopted a moving-target strategy to this litigation. Irving's articulation of how these facts relate to her discontent with these defendants has been coherent, although the legal sands have been shifting somewhat as she ably moved through the dispositive pleading phase. I acknowledge that Irving has a clear vision of how, based on the facts, her 'rights' were violated. That said, I must apply the not always flexible legal standards to the facts as forwarded by these cross movants.

On the record before me Irving was given a full opportunity to exercise her First Amendment rights vis-à-vis her suspicion of her neighbor and she was afforded ample process to have her complaints reviewed. Rather than there being demonstrable evidence that her rights to equal protection under the law were infringed, the record demonstrates that she was afforded a protection of the law the footprint of which could conceivably show up in a case by a different plaintiff as an illustration of how his or her case could have been similarly perused despite a reasoned conclusion that the citizen's allegations were without legal merit.

I enter judgment in favor of the defendants as to all claims and deny Irving judgment on her motion.

**So ordered.**

May 27, 2011                                           /s/ Margaret J. Kravchuk
                                                       U.S. Magistrate Judge